UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CYNTHIA "CINDY" FOSS, HUNTER FOSS DESIGN & INTEREST, <br>           Plaintiffs, <br><br> v. <br><br> MARVIC, INC. D/B/A BRADY-BUILT SUNROOMS, BRADY-BUILT., JOHN DOES, CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS, LLC, <br><br>           Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ. No.: 4:20-cv-40057-MRG |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### [ECF. Nos. 96, 97]

**GUZMAN, J.**

Cynthia Foss ("Plaintiff" or "Foss") brings this suit against Marvic, Inc. ("Marvic") and Brady-Built Sunrooms ("Brady-Built") (collectively "Defendants") alleging infringement of her copyright for a brochure produced on Marvic's behalf in 2006. This matter is presently before the Court on the Defendants' Motions for Summary Judgment, [ECF Nos. 96, 97], by which Defendants are seeking summary judgment on the only remaining count of copyright infringement. Defendants introduce several theories as to why summary judgment must be granted:

> (1) Foss has failed to allege any facts to support any theory of liability against Brady-Built, and failed to provide evidence that Brady-Built should be held liable as a successor corporation; (2) Foss is not the rightful owner of the copyright associated with the 2006 Brochure; (3) Foss's certificate of copyright registration for the 2006 Brochure is invalid; (4) Foss's work is not copyrightable; (5) even if this Court finds that Foss had a valid copyright in the 2006 Brochure, Marvic, Inc. and Brady-Built had an implied license to use the 2006 Brochure; (6) the claim is barred by the statute of limitations; (7) the court lacks personal jurisdiction over Marvic; and (8) Foss may not maintain a claim against fictitious defendants.

1

[See id.]. Additionally, before the Court is Defendants' Motion for the Issuance of a Request to the Register of Copyright ("Register"), [ECF No. 102], where the Defendants request that the Court issue a proposed question to the Register pursuant to 17 U.S.C. § 411(b)(2) to ultimately invalidate Ms. Foss's copyright ownership based on her deposition testimony and other evidence.

For the reasons stated below, the Motions for Summary Judgement, [ECF Nos. 96, 97], are **GRANTED**. The Motion for the Issuance of a Request to the Register, [ECF No. 102], is **GRANTED** in an order filed separately on the docket. [See ECF No. 126].

## I.    BACKGROUND[1, 2]

As these motions for summary judgment are unopposed, the Court deems the factual background provided by Defendants in their filings as admitted. See L.R. 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."). Because Defendants have moved for summary judgment, the Court must review the evidence in the light most favorable to Plaintiff and make all reasonable inferences in her favor. See Fed. R. Civ. P. 56(a); SEC v. Sharp, 692 F.Supp.3d 9, 10 (D. Mass. 2023). Moreover, as this matter appears on summary judgment, the Court must distinguish which facts are truly material and consider whether – in the face of undisputed *material* facts – legal standards constrain Plaintiff's claims such that the Defendant is entitled to judgment as a matter of law. See Triumph Foods, LLC v. Campbell, 742 F. Supp. 3d 63, 69 (D. Mass. 2024) (citing Anderson v. Liberty Lobby Inc., 447 U.S. 242, 248 (1986)).

---

[1] The facts are drawn from Plaintiff's Amended Complaint [ECF No. 9], Defendants' Local Rule 56.1 Concise Statement of Undisputed Material Facts [ECF Nos. 98, 99], and the documents cited therein [ECF Nos. 96, 97, 106, 108].

[2] The Court relies on Defendants' pleadings but notes that several of the citations in these pleadings do not match the record evidence provided to the Court. Many of the cited exhibits in the Defendants' Concise Statements of Undisputed Material Facts were inaccurately cited or not provided for the Court's review. The Court has cited the appropriate evidence to support the following ruling.

A. **The 2006 Brochure**

The Defendant, Marvic, Inc. d/b/a Brady-Built Sunrooms (misnomer, hereinafter "Marvic") operated a sunroom manufacturing and installing business based in Auburn, Massachusetts until around December of 2017 and dissolved on March 24, 2018. [ECF No. 99 ¶ 1; ECF No. 98 ¶ 1]. The Defendant, Brady-Built, Inc., owns a business known as Brady-Built Sunrooms. [ECF No. 98 ¶ 2]. The Plaintiff, Foss, worked in graphic design from around 1999 to 2016. [Id. ¶ 3]. Hunter Foss Design ("Hunter Foss"), incorporated from 2001 – 2010 and thereafter operating as a sole proprietorship until 2016, is the name of the company Ms. Foss operated under while doing graphic design work. [Id. ¶¶ 4, 5].

Beginning approximately in 1997, Marvic used brochures to showcase the Brady-Built sunrooms. [ECF No. 99 ¶ 5]. Prior to contracting with Ms. Foss in 2006, Marvic worked with Artco, a graphic arts company that also did printing to produce its brochures. [Id. ¶ 6]. Marvic would provide Artco with the content for the brochure, including approved testimonials, pictures of the product, copy, and overall layout. [Id. ¶ 7]. Artco would provide Marvic with a proof and final brochure based on the company's direction and would receive feedback and edits for the final product. [Id.] Annually, Marvic would print around fifteen hundred to three thousand copies of its brochures for distribution to customers via mail, e-mail, or Marvic's website. [Id. ¶¶ 8, 9]. In 2003, the Marvic Brochure was twenty pages long, consisting of a letter to the prospective customer, testimonials, paragraphs of text, phrases such as "Built with Pride to Last a Lifetime" and "Comfort and Convenience are Built In," illustrations and diagrams, and photographs of the sunrooms and the team. [Id. ¶ 11]. On page 2 of the 2003 Brochure, the bottom left-hand corner bears the notation, "© Marvic, Inc. 2003." [Id. ¶ 12]. In 2003, Marvic started using its 2003 Brochure instead of its 1997 Brochure. [Id. ¶ 13].

Around 2006, Marvic hired Ms. Foss to update Marvic's 2003 Brochure. [Id. ¶ 15]. An employee from Marvic, Kevin Kieler ("Kieler"), provided Ms. Foss with a copy of the 2003 Brochure and explained

3

to Ms. Foss that the scope of the project was to update the 2003 Brochure. [Id. ¶ 16]. Ms. Foss then prepared and sent Marvic a proposal for her work. [Id. ¶¶ 17- 18 (citing ECF No. 106-1 (hereinafter "Kevin Kieler Depo.") at 118:4-24; ECF No. 106-3 (hereinafter "Foss Jan. 15, 2025, Depo.") at 33:1-36:24; ECF No. 106-5 (hereinafter "Proposal" at 24-25)].

The Proposal identified Marvic's responsibilities as (1) proofreading, (2) supplying all copy via disk/e-mail, and (3) artwork/images. [ECF No. 98 ¶ 20 (citing Proposal at 25)]. The Proposal from Ms. Foss stated that her contract included "usual and customary fees for research and design of (1) 20-page brochure only; presentation of up to 3 comprehensive designs showing style; 1 final layout showing format; 2 rounds of revisions; pdf files for email proofs; all file preparation for printer, and permanent archiving." [Id. ¶ 21 (citing Proposal at 25]. There is no mention of copyrights or licensing in the Proposal. [Id. ¶ 22 (citing Proposal at 24-25)]. According to Ms. Foss's deposition testimony, Ms. Foss and Marvic never discussed copyrights regarding the 2006 Brochure, nor did Ms. Foss ever present Marvic with any contract discussing a copyright agreement limiting the use of the 2006 Brochure, or an agreement for copyright licensing. [Id. ¶ 23 (citing Kevin Kieler Depo. at 118:13-21; Foss Jan.15, 2025, Depo. at 138:4-140:10)]. In Ms. Foss's deposition testimony, she stated that Marvic provided her with the photographs, illustrations, text, and instructions on how to lay out the content. [Id. ¶ 25; see Foss Jan 15, 2025, Depo. at 149:6-12, 140:23-146:24, 147:24-151:8)]. The 2006 Marvic Brochure had significant overlap with the pre-existing 2003 Brochure, sharing many of the same copy, testimonials, photographs, and illustrations. [Id. ¶ 24 (citing ECF No. 101, Addendum 1 "Comparison Chart")]. Ms. Foss's adaptation of the Brochure made stylistic changes, including adjusting the colors, fonts, and sizing of the photographs. [Id. ¶ 25-26 (citing Foss Jan.15, 2025, Depo.  at 150:10-13, 153:18-24, 154:1-12, 156:8-24, 157:1-15)].

On page 2 of the inside cover of the final 2006 Brochure, Ms. Foss added "© 2006 Marvic Inc." and left a "big white space open for the stamp and addressing" to allow the brochure to be mailed to

customers. [Id. ¶ 27 (citing Foss Jan.15, 2025, Depo. at 81:1-83:23; ECF No.97-6 at 4)]. Once the draft was finalized, Ms. Foss obtained a print estimate for quantities of 5,000; 7,500; or 10,000 copies of the 2006 Brochure and gave Keiler a copy of the final files and e-mailed the files to the printer. [Id. ¶¶ 28-29 (citing Kevin Kieler Depo. at 138:4, 139:1-6; Foss Jan. 15, 2025, Depo 81:1-6, 91:16-17; Proposal at 28)]. On or around September 28, 2006, Ms. Foss provided Marvic with two invoices related to the color prints sent to Artco. Inc. Printers and the balance of the catalog design. [Id. ¶¶ 30-31]. The September 28 Invoice does not reference copyright or licensing fees. [Id. ¶ 32, (citing Proposal at 26)]. After the 2006 Brochure was complete, Ms. Foss did not perform any additional work for Marvic and did not have any future contact with Marvic employees related to future Marvic projects. [Id. ¶ 33 (see Kevin Kieler Depo. at 145:2-21; Foss Jan. 15, 2025, Depo.at 47:2-23)].

    B. **Marvic and Brady-Built: The Transaction**

Around December of 2017, Nathaniel Cosper ("Cosper") incorporated Brady-Built, Inc. ("Brady-Built"), in part for the purpose of purchasing the assets of Marvic, Inc. ("the Transaction"). [ECF No. 99 ¶ 34]. The company is structured as an S corporation and does not have the same board of directors or corporate officers as Marvic. [Id. ¶ 35]. Cosper holds ninety (90) percent of Brady-Built shares. [Id. ¶¶ 36, 41 (citing ECF No. 108-7, hereinafter "Nathaniel Cosper Depo." at 161:8-13)].

Brady-Built paid $710,000.00 for the purchase of Marvic's assets. [Id. ¶ 40]. After Brady-Built purchased the assets of Marvic, it did not maintain every vendor Marvic historically used and sent several customers a letter informing them that Brady-Built was not a successor to Marvic and would not be able to honor the warranty made by Marvic. [Id. ¶¶ 37, 38]. After Brady-Built purchased the Marvic assets, it "incorporated a different marketing and advertising plan, different salespeople, different sales compensation plan, different products, different websites, hired new counsel, a new accountant, new IT

consultants, and implemented its own business approach including employing its own pricing model for its products." [Id. ¶ 39 (citing ECF No. 108-8 at 388:7-391:23)].

### C. The Asset Purchase Agreement

The $710,000 purchase price for Marvic's assets consisted of cash, equity, and a seller's loan back to the buyer. [Id. ¶ 41]. In the Asset Purchase Agreement ("APA"), Brady-Built did not assume all of Marvic's liabilities. [Id. ¶ 43]. The "Purchased Assets" transferred from Brady-Built to Marvic included "all websites, domain names, web addresses, displays, catalogues, literature, manuals, advertising materials, promotional materials, client and customer lists and records, supplier lists, personnel records, sales records and other books and records." [Id. ¶ 44 (citing 96-2 at 4, Section 2(a)(v)]. The "Purchased Assets" transferred to Brady-Built from Marvic included "all designs, plans, blueprints, trade secrets, processes, procedures, know-how, formulae, research and development files, patents, trademarks, and copyrights." [Id. ¶ 45 (citing 96-2 at 4, Section 2(a)(viii)].

### D. This Litigation

In the summer of 2016, Ms. Foss met with Kieler for a graphic design job for a different company. [Id. ¶ 48]. Ms. Foss states in her deposition and filings, that during the meeting she noticed Kieler take a 2011 version of Marvic's brochure out of his bag. [Id. ¶ 49]. As a result of this brief view of the 2011 Brochure, Ms. Foss believed that Marvic was unlawfully copying her work in the 2006 Brochure. [Id. ¶ 50 (citing ECF No. 108-4, hereinafter "Foss, Jan. 15, 2025, Depo." at 50:20-21, 117:16-17)]. On January 19, 2018, Ms. Foss filed a Complaint in Federal District Court against Marvic d/b/a Brady-Built Sunrooms ("Action I"), alleging, among other things, copyright infringement, wherein she alleged the "unauthorized use of her 2D visual artworks, created and owned exclusively by her, and licensed, in part, exclusively to Brady-Built Sunrooms, for specific use in their 20 page Catalog." [Id. ¶ 51 (citing ECF No. 108-10]. At that time of filing her 2018 Complaint in Action I, Ms. Foss did not have a copyright registration in the

2006 Brochure. [Id. ¶ 52]. That Complaint was subsequently dismissed because she did not have an active copyright registration at the time of filing. [Am. Compl. ¶ 3].

### a. Foss's Application to the US Copyright Office

In 2018, during the pendency of her first litigation, Ms. Foss applied to the U.S. Copyright Office ("Copyright Office") for her work on the 2006 Brochure. [ECF No. 99 ¶ 51]. Over a ten-month period, Ms. Foss applied for a copyright registration on at least three occasions, and her application for registration was denied twice. [Id. ¶ 53 (citing ECF No. 108-11 at 23-86)].

Ms. Foss first applied for copyright registration (No. 1-6335069771) on February 28, 2018, as "One Work by One Author," titling the work "Brady Built Sunrooms Catalog Design © 2006 Hunter Foss Design" and listing "Cynthia Alyson Foss" as the sole author. [Id. ¶ 54]. Defendants argue that for these applications, "Foss knew that (1) Marvic provided the text, photographs, and illustrations contained therein, (2) the 2006 Brochure was based on the 2003 Brochure, and (3) Foss herself added '© 2006 Marvic, Inc.' to page 2 of the 2006 Brochure." [Id. ¶ 54 (citing ECF No. 108-11 at 23)].

Approximately, ten months later, on December 4, 2018, an agent from the Copyright Office informed Ms. Foss that it would not "'register a claim in artwork that is based only on the format, layout or the arrangement of material on the printed page or a webpage' because 'copyright cannot protect the layout, format, or overall graphic design of a page'" and requested Ms. Foss identify what she sought to register. [Id. ¶ 55]. Ms. Foss relayed to the Copyright Office that she "created the whole 20 pages of graphic works into 1 whole full catalog of design." [Id. ¶ 56]. In response, on December 12, 2018, the Copyright Office subsequently denied Ms. Foss's Application (No. 1-6335069771) because Ms. Foss was not the author of the photographs or text. [Id.]

On March 19, 2018, while her first application was still pending, Ms. Foss filed a second application for registration (No. 1-6400839751) wherein she titled the work "Brady-Built Sunrooms 20

7

pg. Brochure Design © Hunter Foss Design 2006" and listed the author as "Cynthia Alyson Foss." [Id. ¶ 57]. The second application (No. 1-6400839751) was denied in November 2018, because Foss's application "was filed to cover the design and layout of the catalog" and "[c]opyright does not protect familiar symbols or designs; basic geometric shapes; words and short phrases such as names, titles, and slogans; or mere variations of typographic ornamentation, lettering or coloring." [Id. ¶ 58].

Finally, Ms. Foss, on December 3, 2018, applied for registration for the third time (No. 1-6294803781) [Id. ¶59]. On this application, Ms. Foss adjusted the authors associated with the work, listing authors as "Cynthia Alyson Foss," "Cynthia Foss dba Hunter Foss Design, Inc.," and "Marvic Inc. dba Brady-Buikt [sic] Sunrooms, Inc." [Id.] Two days later, an agent from the Copyright Office asked Ms. Foss to specify the "artwork" she was seeking to register. [Id. ¶ 60]. Ms. Foss informed the agent that she was "'the exclusive author and claimant to [the 2006 Brochure]' and that '[a]ll 20 pages of graphics were created only by [Foss],' and further requested that the Copyright Office remove 'Marvic dba Brady-Built' as an author." [Id. ¶ 60].

While the December 3, 2018, Application (No. 1-6294803781) was pending, the District Court granted summary judgment in Marvic's favor and dismissed Foss's Complaint in Action I, which was affirmed on appeal. [Id. ¶ 61]. After the Complaint in Action I was dismissed, Ms. Foss learned that the Copyright Office had registered her copyright on December 13, 2019. [Id. ¶ 62]. That same day, on December 13, 2019, Ms. Foss filed her appeal of the Court's dismissal of Action I. [Id. ¶ 63].

The present action ("Action II") was filed on May 22, 2020, wherein she named "Marvic, Inc. d/b/a Brady-Built Sunrooms" and "John Does" as defendants. [Id. ¶ 64 (citing ECF No. 1)]. Ms. Foss filed her Amended Complaint in Action II on September 21, 2020, wherein she added Brady-Built, Inc. and Charter Communications, LLC as defendants. [Id. ¶ 65].

### E. Procedural History

This case has a lengthy procedural history, which has been properly outlined by previous court decisions, including <u>Foss v. Marvic et al.</u>, 103 F. 4th 887 (1st Cir. 2024). [ECF No. 75 at 2-9]. This Court will not repeat the eight-year history once more. In short, the case involving the 2006 Brochure was initiated in January 2018, where summary judgment was later granted for the Defendants. See <u>Foss v. Marvic</u>, 365 F. Supp. 3d 164 (D. Mass. 2019) ("Action I"). The present action was filed on May 22, 2020 ("Action II"). [ECF No. 1]. Ms. Foss has brought two appeals before the First Circuit regarding the brochure at issue here. See <u>Foss v. Marvic Inc.</u>, 994 F. 3d 57 (1st Cir. 2021) ("Appeal I"); <u>Foss v. Marvic et al.</u>, 103 F. 4th 887 (1st Cir. 2024) ("Appeal II"). At the conclusion of the second appeal, one claim remains in the case for the District Court's consideration at summary judgment, Ms. Foss's copyright infringement claims against Marvic and Brady-Built.

### a. Extension of Time Requests

Plaintiff in this action had sufficient opportunity to respond to the Defendants' Motions for Summary Judgment and failed to do so. On May 12, 2025, Defendants each filed a Motion for Summary Judgment with supporting memorandum and Statements of Material Facts pursuant to Local Rule 56.1. [See e.g., ECF Nos. 96-101, 106, 108]. Plaintiff had 21 days to submit a response. L.R. 56.1. On June 13, 2025, Plaintiff filed an assented-to Motion for Extension of Time until June 30, 2025, after her deadline for a response lapsed. [ECF No. 109]. Bearing in mind that the motion was assented-to, the Court granted the extension. [ECF No. 110]. On June 30, 2025, after the Court's closing hour, Plaintiff filed for another extension of time to extend all deadlines in pending motions by 14 days due to physical injury and a family hospitalization. [ECF No. 113]. Defendants opposed the motion, and the Court denied the extension. [ECF Nos. 114, 115]. On July 14, 2025, Plaintiff filed another Motion for Extension of time. [ECF No. 116]. Counsel Grimm asserted to the Court that he needed just **ten days** to respond properly to the summary

9

judgment motion due to serious family medical issues and the death of a close friend. [Id.] The Defendants quickly filed their opposition. [ECF No. 117]. The Court, recognizing the weight of counsel's purported grief and family obligations, and understanding the implications of an unopposed summary judgment for his client, granted the motion for extension of time. [ECF No. 118]. The Court explicitly stated in its order that "there [would] be no further extensions of these deadlines." [Id.] The deadline on July 24, 2025, set by Plaintiff's counsel, came and went. Plaintiff's counsel once more, tried to take advantage of this Court's grace, and filed an extension of time request at the midnight hour, claiming that he could not file Plaintiff's opposition because he had a "debilitating headache." [ECF No. 119]. The Court declines to find this reason as constituting good cause given the substantial delay and extensions already granted to Plaintiff.

Counsel had sufficient time to file Plaintiff's appropriate opposition papers, was granted several opportunities to do so, and still failed to meet the self-imposed deadlines. Therefore, it should be no surprise to Plaintiff or her counsel, that the Court treats the facts contained in the Defendants' motions as admitted.

## II.  LEGAL STANDARDS

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250

(quotations omitted). The nonmoving party may not "rest upon mere allegation or denials of his pleading," but must "present affirmative evidence." Id. at 256-57. When a non-moving party fails to meet a reasonable deadline to submit a concise statement of the contested material facts pursuant to Local Rule 56.1, the court may "treat the summary judgment motion as unopposed and deem admitted all facts presented as uncontested by the movant." Mouliert-Vidal v. Flores-Galarza, 165 F. App'x 866, 871 (1st Cir. 2006); see L.R. 56.1.

In the event that a summary judgment is unopposed, the court may not, however, simply grant the unopposed motion for summary judgment as a matter of course. Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006). The unopposed summary judgment motion still must be scrutinized in accordance with Fed. R. Civ. P. 56. Nepsk, Inc. v. Town of Houlton, 283 F.3d 1, 7-8 (1st Cir. 2002). Therefore, the district court is "still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." Aguiar-Carrasquilo, 445 F.3d at 25 (quoting Mullen v. St. Paul Fire and Marine Ins. Co., 972 F.2d 446, 452 (1st Cir. 1992)). If those facts entitle the moving party to judgment as a matter of law, summary judgment will be granted.

The First Circuit may overturn a District Court's decision to refuse to grant an extension of time, when a litigant was "reasonably surprised by the deadline or the action of the court, or the events leading to the contested decision were unfair." Perez-Cordero v. Wal-Mart P.R., 440 F.3d 531, 534 (1st Cir. 2006); see United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995) ("For the purpose of determining whether a denial of a continuance constitutes an abuse of discretion, each case is sui generis.").

Plaintiff, in this case, was adequately informed of the deadlines expected of her counsel and had several extensions of time granted to allow a proper opportunity to respond. Yet, she failed to do so. Therefore, the Court will treat the summary judgment motion as unopposed and accept as true all material facts set forth by the moving party with appropriate record support. Aguiar-Carrasquilo, 445 F.3d at 25.

### III. DISCUSSION

Plaintiff's only remaining claim is one for copyright infringement. [See ECF No. 75, "Appeal II, Decision"]. Plaintiff in her Amended Complaint asserts that Marvic, Brady-Built, and its John Doe employees directly and/or indirectly infringed Ms. Foss' copyright in the brochure through reproduction, derivation, distribution, and display. [Am. Compl., ECF No. 9 ¶¶ 68-72].

"The holder of a valid [visual art] copyright possesses exclusive rights to reproduce and distribute not only exact 'copies' of the [work] but also 'derivative works' based upon it." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009) (quoting 17 U.S.C. § 106). "A person who trespasses upon any of these exclusive rights may be held liable for copyright infringement." Id. (citing 17 U.S.C. § 501). To succeed on her claim of copyright infringement under 17 U.S.C. §§ 106 (1)-(3), (5), Ms. Foss must "establish 1) ownership of a valid copyright and 2) a copy of constituent elements of the copyrighted work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Strike 3 Holdings, LLC v. Doe, 757 F.Supp.3d 99, 103 (D. Mass. 2024).

Marvic and Brady-Built each bring a motion for summary judgment, asserting many of the same arguments to defeat Ms. Foss's claim. The Court will address several of the Defendants' arguments that it finds most persuasive.

#### A. The Validity and Ownership of Foss's Copyright

Defendants argue that Plaintiff Foss intentionally misrepresented her work to the Copyright Office to obtain a Copyright in work product that was not copyrightable, and, therefore, she is not the rightful owner of the copyright associated with the 2006 Brochure. [See generally, ECF Nos. 96-97, 106-108]. In response to Ms. Foss's deposition testimony, Defendants petitioned this Court to issue a request to the Copyright Office to inquire whether her copyright registration would have been refused had the Copyright Office known the context of her depositions taken on January 15 and 27, 2025. [ECF No. 107].

An essential element of a copyright infringement claim is to possess a valid copyright registration. 17 U.S.C. § 411(a). Before a Court may nullify a copyright registration, the Court must obtain an opinion from the Copyright Office confirming that the Register would have denied the application if it were presented with the relevant facts of the litigation. 17 U.S.C. § 411(b)(2) ("In any case in which inaccurate information . . . is alleged, the court *shall* request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.") (emphasis added); see Palmer/Kane LLC v. Rosen Book Works LLC, 188 F. Supp.3d 347, 348 (S.D.N.Y. 2016) (citing cases); see generally, Lopez v. Davis, 531 U.S. 230, 241 (2001) (noting Congress's use of the word "'shall' to impose discretionless obligations"). A court must request advice from the Copyright Office when there are allegations that the inaccurate information "was included on the application for copyright registration with knowledge that it was inaccurate," and not a mere good-faith mistake. 17 U.S.C. § 411(b)(1); Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 595 U.S. 178, 187 (2022) (holding that "it would make no sense if §411(b) left copyright registrations exposed to invalidation based on applicants' good-faith misunderstandings of the details of copyright law.")

As described in the Court's concurrent order, [ECF No. 126], after careful review of the Defendants' pending motions, the Court determined that Defendants met their burden to satisfy the statutory criteria for a mandatory referral, and the Court is obligated to send a letter to the Copyright Office in this action pursuant to 17 U.S.C. § 411(b)(2). The letter will be issued to the Copyright Office for the final determination of the copyright registrations' validity, with a requested response within 30 days.

Therefore, the Court will not make a definitive ruling in this Order on whether the Copyright Office erred in its issuance of Ms. Foss' copyright, Registration No. Vau 1-378-470, due to intentional misrepresentations. The motions for summary judgment can be resolved on other grounds.

### A. Liability of a successor corporation

Defendant Brady-Built argues that Ms. Foss has failed to allege any facts to support a theory of liability against Brady-Built and failed to provide evidence that Brady-Built should be held liable as a successor corporation.

Massachusetts courts are aligned with most jurisdictions, "follow[ing] the traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed upon the successor corporation which purchases its assets." DeJesus v. Park Corp., 530 Fed. Appx. 3, 5 (1st Cir. 2013) (citing Guzman v. MRM/Elgin, 567 N.E.2d 929, 931 (Mass. 1991)). There are four exceptions where a court may break from this rule and hold a successor liable for the torts of its predecessor corporation.

> (1) the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities; (2) the transaction is a merger of the two entities; (3) the purchaser is a mere continuation of the seller corporation; and (4) the transaction is a fraudulent attempt to evade the seller's liabilities.

Devine & Devine Food Brokers, Inc., v. Wampler Foods, Inc., 313 F.3d 616, 618 (1st Cir. 2002) (citing first to Dayton v. Peck, Stow, & Wilcox Co., 739 F.2d 690, 692 (1st Cir. 1984) then 15 W. Fletcher, LAW OF PRIVATE CORPORATIONS §§ 7122, at 227-243 (1999)).

The Amended Complaint is devoid of any facts alleging that Brady-Built directly or indirectly infringed on Ms. Foss's copyright, nor are there any facts or evidence presented to the Court in other filings to support an application of these exceptions under the traditional rule. [See Am. Compl.].[3] Brady-Built initially brought the argument regarding successor liability in its Motion to Dismiss, [ECF Nos. 29, 59], which was granted by Judge Hillman on the grounds of *res judicata.* [ECF No. 65]. Plaintiff did not

---

[3] See ECF No. 108-4, Foss Jan. 15, 2025, Depo., 50:14-23,
    Q: Are you making any claims against Brady-Built, Inc.?
    A: They are listed as a defendant.
    Q: Do you have any factual basis to support a claim for copyright infringement against Brady-Built?
    A: I have nothing. All I did was see this 2011 brochure in 2016. I tried to get back in touch with Kevin Kieler and Brady-Built, Inc. came to say that they were the successor of the company.

14

address the argument of successor liability in her opposition to the Motion to Dismiss, rather she focused her argument on the issue of *res judicata,* which was later successful on appeal at the First Circuit. [ECF Nos. 63, 75]. In this case, there is no opposition filed to counter Defendant Brady-Built's arguments that the four standard exceptions to the traditional rule are inapplicable in this case, nor are there any other exhibits or filings on the docket which the Court may weigh in favor of Plaintiff for this issue. Aguiar-Carrasquilo, 445 F.3d at 25 (quoting Mullen, 972 F.2d at 452 (holding that in the event of an unopposed motion for summary judgment the district court is "still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate.")).

Therefore, for the reasons stated in Brady-Built's supporting memorandum, [ECF No. 108], *i.e.,* that Ms. Foss has failed to sufficiently allege any facts to support a theory of liability against Brady-Built and there is no basis to hold Brady-Built liable as the Successor Corporation to Marvic, Brady-Built's motion for summary judgment, [ECF No. 96], is **GRANTED**.

### B. Implied license theory

Defendants Marvic and Brady-Built both argue that even if the Court and the Copyright Office were to find that Ms. Foss had a valid copyright in the 2006 Brochure, Defendants had an implied license to use the 2006 Brochure. Given the evidence in the record, including deposition testimony from Ms. Foss, the Court agrees.

When a creator obtains a registered copyright of a creative work, the copyright holder may transfer a nonexclusive right to use that creative work by either express or implied licensing of the copyrighted work. 17 U.S.C. § 204. The existence of an implied nonexclusive license is an affirmative defense to an allegation of copyright infringement. I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996); Nelson-Salabes, Inc. v. Morningside Dev., 284 F.3d 505, 514 (4th Cir. 2022). An implied license may occur "without any particular formality, as by conduct manifesting the owner's intent." Est. of Hevia v. Portio

15

Corp., 602 F.3d 34, 41 (1st Cir. 2010) (citing <u>John G. Danielson, Inc., v. Winchester-Conant Props., Inc.</u>, 322 F.3d 26, 40 (1st Cir. 2003)). The rights under an implied license are "limited in scope; it 'simply permits the use of a copyrighted work in a particular manner.'" <u>Id.</u> (citing <u>I.A.E.</u>, 74 F.3d at 775). When the use of a copyrighted work is "within the bounds of an implied license," the license-holder does "not infringe the copyright." <u>Id.</u> (citing <u>Danielson</u>, 322 F.3d at 40).

The Defendants have the burden to put forth evidence "whether the licensee requested the work, (2) whether the creator made and delivered that work, and (3) whether the creator intended that the licensee would copy and make use of the work." <u>Est. of Hevia</u>, 602 F.3d at 41 (citing <u>Nelson-Salabes</u>, 284 F.3d at 514). The issue of a parties' intent is the "determinative issue" for an implied license analysis. <u>Nelson-Salabes</u>, 284 F.3d at 515.

The predominant test of intent was developed in the Fourth Circuit and later adopted by the First Circuit. <u>See</u> <u>Danielson</u>, 322 F.3d at 41 (citing <u>Nelson-Salabes</u>, 284 F.3d at 515). These considerations do not represent an "exhaustive list of factors to consider," but provides the Court with a framework for determining the parties' intent. <u>Id.</u> The factors include:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such, as [a] standard . . . contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

<u>Id.</u> (citing <u>Nelson-Salabes, Inc.</u>, 284 F.3d at 516).

Without a recommendation from the Copyright Office indicating otherwise, the Court cannot nullify a copyright registration, therefore, the Court must proceed as if the copyright registration is valid. In this case, even if the Copyright Office were to state Foss obtained a valid copyright, the evidence that Foss granted Defendants an implied nonexclusive license to use the 2006 Brochure is compelling. The undisputed facts and all three *Nelson-Salabes* factors point in the direction of an implied license.

In the present case, the first two prongs of the *Nelson-Salabes* factors are easily satisfied. The main concern here, is whether Foss *intended* for Marvic to copy and make use of her work. The parties had a short-term discrete transaction, where Marvic's representative Kevin Kieler, requested the work from Foss in 2006, which Foss then made and delivered the work to Marvic. [ECF No. 98 ¶¶ 17, 18, 28, 30-31; see Foss Jan. 15, 2025, Depo., 30:4-14, 33:20-36:21, 47:2-15; Proposal at 24-26]; see also Danielson, 322 F.3d at 41 (determining that an architect's "intent to remain involved" in a long-term project, rather than a one-time arrangement, "point[s] away from a[n implied] license[.]"). Although the parties have been tied together in litigation for over eight years, the relationship between Ms. Foss and Marvic particular to her actual work product was limited. Ms. Foss was hired to complete the 2006 Brochure for Marvic and then did not have any future projects with Marvic. [Foss Jan. 15, 2025, Depo., 47:19-22 ("Q: So in between 2006 and 2017 you had no communication with anyone you understood to be associated with Marvic, Inc. for reasons related to Marvic, Inc? A: Correct")]. Ms. Foss did not have any contact with Marvic employees until 2016 when she met with Mr. Kieler to discuss a project for a different business. [Id. 47:2-11].

The parties here did not have a written contract that provided any guidance for copyrighted materials, Ms. Foss's future involvement in any Marvic projects, or express permission or limitations on the Brochure. Instead, the parties had an oral agreement which was later outlined by Ms. Foss in a written proposal, which identified Marvic's responsibilities, Foss's expected work product, and the price for her work product. [ECF No. 98 ¶¶ 18-21]. It is undisputed that there was no agreement between the parties of licensing or copyrights, and no discussion of Foss's future involvement or consent in distribution until 2017.[4] [Id. ¶¶ 22-23, 32]. In short, there was no agreement limiting the use of the work.

---

[4] In 2017, Foss sent a demand letter and a new "standard contract" which would include royalties for the use of her not-yet-obtained copyright. [Proposal at 24-26; Kevin Kieler Depo., 138-140:10].

17

Finally, in her deposition, Ms. Foss states that she added the © Marvic signature to her final draft of the brochure, similar to the 2003 Brochure, and that she intentionally left space for a mailing address on the brochure, so that the Brochure could be distributed by mail. [ECF No. 98 ¶¶ 27-30; Foss Jan. 15, 2025, Depo., 41:13-17, 81:1-83:21].[5] Before providing the final product to Marvic, Foss contacted the printer directly for a price check on printing services to get a cost estimate for quantities of 5,000, 7,000, or 10,000 copies of the 2006 Brochure. [See ECF No. 106-5 at 29]. Ms. Foss stated in her deposition that she was aware that Marvic regularly printed thousands of copies of their 2003 Brochure to distribute via hand, mail, and e-mail. [ECF No. 98 ¶¶ 27-30; Foss Jan. 15, 2025, Depo., 41:13-17, 81:1-83:21].

Given the presented evidence, and lack of opposition, Foss' *intent* for Marvic to copy and make use of her work is apparent. The combination of the © Marvic insignia on the Brochure, the empty space for a mailing label, and the personal price check for printing services for volumes in the thousands, seems like nothing less than implied consent for Marvic to reproduce and distribute the 2006 Brochure. "Consent given in the form of mere permission or lack of objections is also equivalent to a nonexclusive license and is not required to be in writing." I.A.E., 74 F.3d at 775. Marvic's use of Foss's creative work was reasonable, foreseeable, and ultimately with implied consent. The distribution of the 2006 Brochure by mail, e-mail, and by hand was within the scope of the implied license granted by Foss.

Even if the Copyright Office determines that the registration (Registration No. Vau 1-378-470) was properly granted, the Court is persuaded that Marvic, Inc. had an implied license to use the 2006 Brochure, which it transferred to Brady-Built as part of the explicit terms of the Asset Purchase Agreement entered into on December 1, 2017. Because Marvic's use of the 2006 Brochure occurred "within the

---

[5] Foss Jan. 15, 2025, Depo. 81:14-23
    Q: Looking at the rear of Exhibit 12, it appears that there's a return address, and it states Brady-Built Sunrooms with the logo, then return address and so forth. So it's designed essentially to be mailed?
    A: Correct.
    Q: Okay. And if – and you understood that it was gonna be mailed given the design?
    A: That's how we made the design. We left a big white space open for the stamp and the addressing.

bounds of an implied license," Marvic did "not infringe the copyright." See Est. of Hevia, 602 F.3d at 41 (citing Danielson, 322 F.3d at 40).

## IV.   CONCLUSION

For the reasons stated above, the Defendants Motions for Summary Judgement, ECF Nos. 96, 97, are **GRANTED**.

**SO ORDERED.**

Dated: January 6, 2026

                                            /s/ Margaret R. Guzman
                                            Margaret R. Guzman
                                            United States District Judge